Marquette and I'm going to let you pronounce your name because there's a very low likelihood that I would get it right. I'd say that's exactly how it's spelled. It's Sheldoney as if it was S-H-A-L-L-D-O-N-I. All right, thank you, Mr. Sheldoney. And good morning to your honors and Henry. Good morning. I'm here on behalf of the of the Jones Act employer and the vessel owner Marquette Transportation on appeal of a case involving a injury to the vessel's master. We're specifically looking at principally at the liability issues and the parallel of both contributory negligence and liability as that has been enunciated in the primary duty doctrine. A string of cases that has like a lot of defenses in the past and the same as has happened in the general maritime law when certain causes or granted to the plaintiff gone through a period of expansion and then gone back through a period of contraction where it falls into balance. Our position today being that you cannot consider the liability of the employer in this context under these facts without looking at the primary duty doctrine because it would ignore the reality of the unique environment that vessel employment provides. You start off with a great disadvantage which is that there couldn't be a more experienced judge in this area than Judge Fallon. He knows this area extremely well and is highly, highly reliable and took a lot of care in this case to get it right. There's no doubt. I know Judge Fallon. I know him from teaching also as an adjunct faculty member at Tulane. I respect him. I know him as a person and I know him as a judge. But the result that we have here today I would submit to you is just not in balance in the result of the treatment of the employer versus the treatment of the employee. We know that Judge Fallon is one, maybe one of the more liberal district court judges, but what we're looking at here today is a almost disregard of the rights of the employer. He doesn't, as I recall, he doesn't use the term primary duty or primary duty theory in his opinion. He doesn't consider it at all, Judge. So tell us how that was raised in the district court. Well, it was raised in the pretrial briefing and it was raised in the proposed findings of fact and conclusions of law. And then it was raised in factual evidence that we put on. In what manner was it raised, the theory itself, in either the pretrial order or the pretrial briefing? Well, it was raised as a contested issue of law in the pretrial order and then it was detailed in the pretrial briefing. So we went through, there would probably be three cases that would be the principal litany of those, which is the original case, the Likes Brothers decision, which is known as the Walker decision. There's the Stewart decision and there's the Fontenot decision. Each of those were detailed. Judge Fallon has actually considered the primary duty doctrine in earlier opinions himself, but they were always involving cases that involved lower ranking crew members, not ones that involved the captain. Here, what is unique is that we're dealing not only with the master of the vessel, but we're dealing with one individual who was injured when no one else aboard the vessel was injured under the exact same circumstances. And we are dealing with the one individual on the vessel who did not follow any of the safety protocols that he not only knew, but he taught and he enforced. But the other person who entered the room with him was not wearing the non-compliant footwear and yet also slipped, isn't that right? Well, there were actually three individuals who ended up entering the engine room, the lower engine room. That would have been the captain, there was a deckhand trainee, that's Corey Crespo, and the lead man, which is basically the senior deckhand. So two of those individuals were wearing compliant gear. They both had on slip-resistant boots. One of them started to slip but steadied himself. That was the green deckhand or the trainee, Corey Crespo. The other one was the lead man. He did two things that are important. One, assuming you would ever enter the lower engine room, which is an entirely distinct issue should you have ever even gone in there. But assuming that you even enter the lower engine room, he had on proper personal protective gear. And the second thing he did, knowing that there was a fuel leak, so this is a known condition, this is not a condition that you encounter without any advanced knowledge, knowing there's a fuel leak, he turned at the bottom of the stairs, he turned to the left and went to the opposite side that the fuel leak was on, turned on one generator, turned off the other, avoided the spray, didn't fall. The captain ran in in slippers. He fell immediately upon stepping on the deck, but he also ran directly into the fuel. And part of that goes back to two different issues. One is, he's dealing with an emergency situation, but he is also the person responsible for teaching the fire trolls aboard the vessel. Captain Dunn says that he knew this was an imminent risk of fire. He wasn't entering the engine room. He wasn't responding because he was trying to stop a fuel leak per se. It wasn't because he was concerned about a slip hazard being on the floor, even though it was a slip hazard. He wasn't doing it to save diesel fuel. He did it and his testimony was clear because I thought there was an imminent risk of fire. That triggers a separate set of protocols on the vessel. One is they are trained on day-to-day safety. And this is, and he's the individual who trains that. They're trained on personal protective gear, situational awareness, identifying slip and trip hazards as part of their basic day-to-day in and out training. But separate and apart from that, they have to anticipate emergency situations on these vessels. They have to anticipate that you may have to respond instinctively. When the company's safety director testified, he testified for almost half a day. His testimony is omitted completely from the district court's opinion. He said we have to teach muscle memory when we are in stressful situations. That's why we drill every single week for fires. And there's one thing that we do. We muster the crew, which is important. Know where everybody is. We identify what the risk is. We come up with a plan. We decide what personal gear you need and we do that. The captain did none of those things. He didn't utilize anything that which for years they had trained to do to respond to this. He simply ran out of the wheelhouse in his slippers, didn't identify a plan, didn't speak with the pilot on what he was going to be doing, ran directly into the lower engine room with a known fire risk, then becomes disabled on the deck. So if you take a look at either one of those two scenarios, we have somebody who is in control of the vessel, who is responsible for teaching the vessel safety protocols and who is responsible for teaching and enforcing the fire drills aboard the vessel. Yet that same individuals, the one who follows none of those procedures when he believes that there is an imminent risk of fire. And that turns out to be the only individual who is injured in this incident. So we have a green deck hand who is able to stabilize himself wearing the proper foot gear and we have a senior deck hand who walks into the same situation. Whatever pressures were on the crew at that moment, that senior deck hand, a lower ranking crew member, is responding under the exact same pressures. He avoids it completely. You place a lot of reliance on Dunn's failure to wear the proper footwear. Is that right? You place heavy reliance on that. Not exclusive, but not exclusive reliance. But I think it's relevant. Well, we look at it in two ways. One is, what did he do to follow the safety, the day to day safety protocols? Second, under that, you would use footwear before you ever entered the engine room. It's a rule he knows. It's a rule that he said he acknowledged. I'm saying I'm repeating maybe a little bit what I said before, but the record, the record shows that one of the other employees wearing the proper footwear also slipped, fortunately was able to grab hold of, I guess it was the engine or whatever, to keep himself from falling. But it seems to me that that, as a logical matter, at least for the finder of fact, Fallon removes the footwear as an issue in the case because the footwear apparently was not the cause one way or the other. The problem is it would be impossible to know that when you go down in slippers. What we know is that the captain went down and fell and went directly to the deck. He never was able to study himself. We know we had two other people who were one who was avoid the fuel altogether and the second who encountered the fuel but was able to study himself to say that if you you don't need to wear footwear when there's a slip hazard present because it's slippery anyway, puts the employer in an impossible catch. 22 is you could not tell the employer it's okay to have a policy where you do not require people to wear slip resistant shoes even when they enter the engine room, an environment that we know and it's detailed in case law. It's being impossible to maintain without some oil present. You can't have an oil free engine room. It's impossibility. So they have a standing rule that you can't enter that without slip wear, without slip resistant shoes. But we're going to say it's okay to not use them because the oil is slippery anyway. So you've put the you put the employer in a position where you say you would be liable if you didn't have a policy of requiring slip resistant boots on board your vessel. But we are not going to mandate that anybody use it in a situation where there when there's a known slip hazard present. I don't want to get into an argument with you about slip resistant boots because I think there's something in the record contrary to what you're saying. But I want to go back to this primary duty, which is what you hang your hat on to a great extent in this case. And as I understand primary duty, and you correct me, it means that the officer or crewman, whoever, has to be totally at fault. And of course, Judge Fallon found no comparative fault here. So by doing that, by implication, he found the primary duty theory doesn't apply. Well, when you bring me around to a point of my analysis that that that it would be that is directly in line with what you're asking me and that the judge didn't do any analysis of the primary duty doctrine in this case in order to determine whether or not this person, whether or not he met his standards, what he did if we took when we talk about whether or not there was a balance in the court's analysis of the evidence, we would look at what was the evidence that was presented to the judge. There were three liability. There were three witnesses who testified on whether or not the captain met his duty. One of those was the was was, um, uh, Mr Thompson, who was the safety director for the vessel for that group of vessels. The other individual, and he's a he is a Coast Guard veteran and as qualified, certainly as qualified as the safety expert on behalf of the United States in the Macondo incident and imminently qualified in vessel operations. And the third was Mr Nichols, a marine surveyor who was qualified, certainly not more qualified than any of the other two individuals. The court did not analyze, in its opinion, the testimony given by either of those other two individuals. And the testimony given by Mr Nichols was was was so far in favor of the plaintiff that would call into question his objectivity. He testified that the captain didn't even place anybody at risk by running into the engine room. He testified that it was fine for the captain to use the deckhand to block the spray of fuel so that it didn't get onto the turbocharger and that didn't put anybody at risk. And then the court accepted that piece of testimony from that one witness that it wasn't necessary to use slip resistant shoes because it was slippery anyway. But the great weight of the evidence was against that. It was that actually following this company's safety protocols would have avoided this risk. In fact, the people who did didn't get injured and that if we would follow the fire safety procedures with a drill, there would have been no need to enter the engine room to begin with, which brings me to a point I see have to watch my time brings me to the point of analyzing why we wouldn't have followed the drills aboard the vessel as opposed to running into the engine room. When there's an imminent risk of fire, you don't enter the engine room at all. That was a horrible risk assumption by the captain. Could have killed himself or other crew members. There's a remote fuel shutoff that sits outside the vessel. You can activate that. It would have terminated. You don't even go inside that space. I thought there was a valid reason given for not doing it that way, which I can paraphrase it, but you can correct me. It had something to do with you turned everything off at that point. The floating in a dangerous position. And that was the rationale the court used. However, the overwhelming weight of the evidence was against that. It assumed that Judge Fallon assumed that the vessel was pushing ahead to chemical barges, but the pilot in the wheelhouse in control of the vessel at the time said they were light boat and that is and the only way that the deckhand who spotted the fuel leak to begin with would have ever spotted it is if they were finished landing the barges and he came back on board the vessel, looked in the engine room and saw the fuel leak. He also said we've landed two barges. Then we left the fleet. Now they're in the intercoastal waterway. They're not at sea. They're at a fleet. They had just used an assist tug to help them bring these two barges in and drop them at the fleet. And it was Captain Dunn who went to the wheelhouse to help the pilot land the two barges in the fleet because the pilot was having difficulty in the wind doing that. So it would be a virtual impossibility that they were still pushing ahead two barges at the time this happened. They had just released an assist tug. They're in the intercoastal waterway. They're next to a fleet. There is no situation that would be more attuned to shutting down your fuel, ask for an assist boat to come help you. You're in protected waters. You have no barges. The clear overwhelming weight of the evidence was that they did not have two barges. The pilot directly testified who's in control of the vessel said, no, we had dropped the barges and we were light boat. And the captain and Dunn admitted that they had just released an assist vessel who was right there close to him. The last point is whether this individual could expect to have uninterrupted future earnings as a captain. He had just come off of two sabbaticals because of panic attacks. He was being treated now. The last piece of medication was Ativan, which is a banned substance by the U.S. Coast Guard. Thank you. I'll reserve the rest of my time. Yes, Mr. Cialdoni, you've saved your full time for rebuttal. Mr. Saunders. May it please the court. Counsel. My name is Henry Saunders, and I'm pleased to be here on behalf of Mr Kelvin Dunn. I want to try to focus the argument on what appellants are raising. Um, first of all, regarding the primary duty doctrine, that is a doctrine that is very seldom used by the courts. It is one that can only be applied when the plaintiff consciously assumed a term duty as a term of his employment. Certainly, Mr Dunn did not assume a duty to maintain the equipment on the starboard generator, either generator on the vessel. Also, it it does not apply where a seaman is injured by a dangerous condition that he did not create and in the proper exercise of his employment duties could not have controlled or eliminated. Again, the hazard, the risk that the condition came from the improper maintenance of the improper maintenance and repair of the starboard generator valve that began to leak. And third, the rule does only will only apply to a knowing violation of a duty consciously assumed as a term of the employment. It does not apply to momentary lapse of care by another otherwise careful seaman. And that is coming from the treatise to the law of seaman section 30 colon 44 contributory negligence. Fifth edition. Now, I'm not even suggesting by any means that there was a lapse of care by Mr Dunn. The overwhelming evidence shows that his decision to enter the engine room was appropriate. Um, that was supported by Corey Crespo, who entered the engine room before him. Contrary to the suggestion that he was a deckhand trainee, he actually was the senior deckhand on duty at the time. There was a lead. I assume you acknowledge that it was unwise for him to be wearing the noncompliant footwear. Um, I would say in a in a perfect setting, yes, he should have his boots on to go into the engine room. Um, if you if you look at the facts, Your Honor, he had just gone. He had woken up. He was off duty. He heard the engines backing down. He went to the wheelhouse and he assisted Captain Brown to write the ship because he was lost in a current. He took the sticks. He was a very experienced captain, very good at at the helm, and he righted the ship. So he saved the boat once he goes outside right outside the engine room, and just shortly thereafter, they get the call from down in the engine room. Now he's still off duty, so he's still in shorts and a T shirt and his his Nike athletic slides. That's when he gets the call. So to so he's faced with a choice there. There's an emergency situation. Everybody agrees that with that, um, to accept their proposition, you would have to accept that Mr Dunn should have gone back to his bunk room and laced up his steel toe boots when he just heard that there's a diesel leak in the engine room. I believe and I believe that the facts show, and I believe Judge Fallon found that the most prudent course of action was exactly what Mr Dunn did. He proceeded down to the engine room. He followed Mr Crespo into the engine room. They both stepped on the diesel about the same time. They both slipped. Mr Crespo caught himself, even though he was wearing the proper PPE shoes. If you look at his testimony, you look at his statement in the record. It's clear that he was slipping and sliding, and the boots really did nothing to would have done nothing to prevent Mr Dunn's fall. Um, so this is also supported by Captain Nichols, who has much more experience than Mr G, the expert who was actually a marine survey and had never testified before this case as a safety expert. In any case, has no published opinions. And Judge Fallon chose not to give his, uh, he reluctantly let him testify, but he chose not to give his testimony much weight. So I want to focus also remind me how long was the was the trial? How many hours or days or whatever? It was a two day trial. Uh, 9 to 5 each day. It was very efficient. We worked well. Yes. And so, uh, some of the testimony was presented by deposition testimony, including Mr Junius Brown, who accident. That's contradicted by both Mr Dunn's testimony that they did have two loaded chemical barges and, uh, the 26 92 form submitted by Marquette to the U. S. Coast Guard. The claims representative who completed this report and it's, uh, in the record at 23 oh, to this form clearly shows that they were transporting to loaded chemical barges at the time of the incident. This was done after some investigation and information was given to Mr Dupuy by the crew, and it shows that they were they were not tied up. They were traveling at approximately five knots with a five mile per hour wind. They were in the Bolivar, Texas area in a very busy waterway. And if you the suggestion that Mr Dunn should have shut off the emergency fuel to the entire engine room, which would have resulted in loss of propulsion, loss of steerage, loss of lighting in darkness in a busy ship channel, pushing two loaded chemical barges, red flag barges, possibly benzene or other more hazardous materials. I think that suggestion is absurd. And what could have resulted had he done that, it could have resulted in mass casualty. And Judge Fallon was well within his discretion to find that Mr Dunn acted reasonably under the circumstances. Mr Dunn's goal was was to save the vessel yet again and to turn off the generator that was leaking and power up the other generator, which was ultimately done by another deckhand. Now, as far as as far as these actions of Mr Dunn, we're looking at ordinary prudence under the circumstances, according to Gautreaux. And the court again was well within its discretion in finding that he did. He did act with ordinary prudence. Also, what was not discussed was that in extremists did apply. Judge Fallon found that this was an emergent situation. And so the conduct of Mr Dunn should be judged under a less strict standard. Moving on to the issue of damages, Marquette does not contest that the general damages awarded. It focuses on the future lost wages and the future surgical procedures. However, the future lost wage issue, Mr Dunn was a was a high wage earner as a boat captain, and that's all he knew was working on the water. He had worked his way up through the ranks. He was a deckhand for about 14 years, and then he was a captain for Marquette for approximately five years. He only has a ninth grade education, and his reading comprehension level is only that of a sixth grader. The award was based on expert testimony. Miss Stephanie Chalfin, a well qualified vocational rehabilitation expert. She gave reasonable alternatives to as to Mr Dunn's transferable skills and what he could do. And Judge Fallon agreed with those with those opinions of Miss Chalfin as far as the future surgical procedures. Mr Dunn was only 39 at the time of this accident. He's got a quite bleak future as it relates to his hip and his lumbar spine. So we had four large screws implanted into his femoral head and the need for the two future hip surgeries. Was supported by the expert testimony of Dr Craig Green, a hip and trauma specialist. It was also set forth in Judge Miss Chalfin's life care plan, which was introduced into evidence, and she testified regarding that. Now, their own doctor, Dr Sanak, testified that he would need a total hip replacement, although he did not comment on the need for a second hip replacement. But Judge Fallon rightly found that hip replacements do not last more than 10 or 12 years, and that is supported by the evidence. And Dr Green testified that Mr Dunn will need a total hip replacement before he reaches the age of 50. Regarding pain management and that this relates to the lumbar spine, Mr Dunn was found to have a herniated disc at the L45 level as well as spondylolisthesis, which is defined as the shifting of the L45 level. And Dr McCarthy explained that the vertebrae moved back and forth. He testified that the best approach is conservative care as long as he can handle it, which would involve injections in the radio frequency ablations. At some point, he will need, according to Dr Dunn, a lumbar spine fusion. And so, in awarding those damages, again, Judge Fallon had ample evidence, ample expert testimony in the record to support that award. Moving on to the argument about his future as a boat captain absent injury, Mr Dunn was, if you look at the record, if you look at the human resources expert employee that testified, Mr Landry Kirk, if you look at Mr Ronnie Dupuy, the claims examiner who looked at Mr Dunn's employment records and his personnel file, Mr Dunn was a stellar employee for Marquette. He had never failed a random drug test. Um, he had never been written up for any disciplinary issues. He was a loyal servant to the company, and he was injured in the service of the vessel. Now, in the five years that he was working as a captain, he did take two breaks. He took a three month break in 2013, and he took about a five month break in 2015. There's an issue being raised by Marquette that one of the medications that he was prescribed the Ativan is a controlled substance, and it would prohibit him from operating a vessel. That is again that that's absurd, because if you look at the record, Mr Landry Kirk admits that in 2013 when he was released to return back to work, he was done so by Marquette's physician chosen by Marquette. They sent him to Dr Hawk, and she examined him and said, You're fit for duty, and they knew that he was being prescribed the Ativan. Now, he was told you cannot take it on the boat, and he never did. As a side note, after this accident, he was drug tested. No alcohol, no controlled substances were found in his system. So if you stop and think about what Marquette is arguing, that he would be they knew he was taking Ativan, and yet they put him at the helm of their vessel. How does that make sense? I just I can't understand it. And Fallon did not give any credence to that argument and was well within his discretion in doing so. That would be Judge Fallon. I'm sorry. Judge Fallon. Absolutely. I was. I was within his discretion. I would also point out that Dr Rachel Wisner was deposed in this case, and she did not testify that he had a progressive pre existing anxiety condition. Dr Wisner testified that in the summer of 2015 he was getting better. She released him to return to full duty. She admonished him. Do not take this controlled stuff substance onto the boat. You only take it when you're at home. She was aware of his ability to continue working as a boat captain if he maintained his medication regimen. She also thought that he would do well as long as he continued to take his medications, and she further testified that she treats many patients in her family practice who take these types of medications, and they function in society, and they are gainfully employed. While you still have time, why don't you shift to a discussion of seaworthiness? Yes. Well, as you know, Judge Marquette has a non delegable duty to provide a seaworthy vessel, and that's where Judge Fallon started off when he, uh, in his written reasons, the valve was leaking. It was spraying diesel in the engine room. A vessel is unseaworthy if it's unfit for its intended purpose. Clearly, a vessel with a leaking generator, a generator that is used to power the entire vessel. That's not a seaworthy vessel. A vessel fuel gauge. It was a fuel gauge in the starboard generator. That starboard generator was powering the entire vessel, but it was no longer. It was no longer safe at the time to operate it because it was leaking the diesel fuel. So when you have a vessel such as diesel on the floor of the engine room, which makes it slippery, which makes it unsafe, that's an unseaworthy condition. The vessel's not, it's not safe. It's not fit for its intended purpose. It can't operate in that manner. Now, the cases cited by by Marquette, they suggest that there's a transient. There's a line of cases where there's if there's a transient condition or if there's operational negligence. I want to address those. The transient condition involves cases where there's just a temporary condition that might be considered unsafe, such as there's a fish gurry case out there where the fishermen, yes, you're gonna have fish slime on the deck and it takes time to move the fish and to clean the deck. Well, when you're when you're working in that condition and you know that you have a safety, there's also a case cited where it's it's there's a mist that comes up every morning. And so the the boat gets wet from the condensation from the dew. And that's a transient condition that might absolve a ship owner from liability because a seaman, a prudent seaman would know that under the circumstances. That is not what we have here. We have a condition that was Judge Fallon found was caused by the negligence of Marquette and failing to properly repair the the fitting. Um, they had worked on in a mere three days before the incident, and the the leak came from that exact spot. Furthermore, getting back to the unseaworthiness, that's a non delegable duty. This is an unseaworthy condition on their vessel. The vessels not fit for its intended purpose. And Mr. Mr. Dunn encountered that dangerous condition and was injured. Now, in conclusion, as you know, questions of of review. I have yet to hear anything from from Marquette to show that Judge Fallon committed clear error. It was he did his job by evaluating the credibility of the witnesses, evaluating the facts of the case and applying it under the law. And if there are differing opinions as to how as to what factual what facts you want to focus on, that's within his purview. If the district court findings are plausible in light of the record viewed in its entirety, this court may not reverse, even if you would have weighed the evidence differently and reached a different conclusion. Um, I will point out one last thing. There's some focus by Marquette on the negligence issue, and that they suggest there's no evidence that Marquette improperly maintained or improperly repaired the valve in question. Well, Marquette violated its own policies and procedures. They failed to prepare a root cause analysis, and we focus on that. And Mr Byron Thompson's testimony, he violates his own policies and procedures. In seven days, they should have had a root cause analysis telling us, telling them why the valve failed and what the crew did wrong. They did not round up the crew and say you should not have gone into the engine room. They did not tell anybody how the valve failed. Nobody told anyone that Kelvin Dunn did anything wrong until this litigation, until they brought up that tactic. And I think that's very important, and that's very telling. They want to suggest that, well, they destroyed the evidence. The hex nipple or whatever it was that failed, they didn't preserve it. And now they want to bury their head in the sand and say, well, you can't prove exactly how it failed, so you can't recover. That's not, that's not what the court's intended. Um, when you look back at the history of the Jones Act and the general maritime law, um, Mr Dunn was injured in the service of the vessel. He was injured when he was trying to save the vessel. And Judge Fallon's opinions are very well reasoned, and we ask that you affirm in all regards. Thank you very much. All right. Thank you, Mr. Vote. Thank you. The first point that I would start off with is asking whether or not we would accept the same explanations from the employer as an as an exculpatory point as to its fault. Will we exculpate? Will we say that the employer was out fault if it did not provide safety gear, if it didn't use its own safety gear aboard the vessel? Or would we allow it to say that it did not need to have an emergency protocol or that there was no need for the lawyer to follow emergency protocols when there was an emergency? Would we accept from the employer that there was no reason to follow drill compliance? Would any of those things be equally treated with the employer under the same circumstances? There is no evidence that the employer failed to have a maintenance program on this vessel. There's no evidence that they failed to have safety rules that they didn't have emergency drills and that they didn't provide a remote fuel shut off that could have been used in all of these circumstances. What about the point about the root cause analysis? The root cause analysis is something that the employer can choose to do, but it's not a basis that you can find that they're liable. That would be a discretionary function that they can choose. The testimony was that they do it in some instances, often in litigation, when a case, in this case, went into litigation very quickly. Often in litigation, the company's not going to engage in a parallel root cause. Is that in the record? Yes. It is in the record that ordinarily in litigation, a company would not engage in a root cause analysis. There's testimony from from Byron Thompson, the safety manager. When he was asked that question, he said, Well, we're engaged in that right now. He said, We have a case where they're already taking testimony. They're already were hiring experts. And so he said, Basically, the process we are going through now would be a form of a root cause. I thought that I thought the root cause analysis, according to Mr Saunders, had to be done within nine days or something. It's again, it's just they they they can choose when they're going to do a root cause analysis. They don't do one in every single accident. And and and they didn't initiate one in nine. Now, they looked into the case, but they didn't initiate a root cause analysis in nine days. What is the basis, if any, in the record for destroying the evidence of the what was it? Well, what was it was that the mechanic carried the valve off with him when he repaired it? I don't know. There's any evidence that he destroyed it. He said he went on. This is the same mechanic who had replaced the fuel filter housing, and he did that voluntarily. He went on to do another repair on the vessel. He was maintaining the gears. He voluntarily decided to go inspect the fuel filter housing that was service that generator because he knew in the past that deck hands crew members gonna have a tendency when they tighten the fuel filters down to bend that housing a little bit. It hangs out of the 90 degree angle. So he went and inspected it. He found some hairline fractures on it and decided it'd be better to go ahead and change that out now. So he took that off, replace it with a new housing. And when he did that, he took this the fuel pressure gauge, which had a stem on it, unscrewed it from the old housing, and then he inspected it. He said, No, we have both. He testified and the director of engineering testified. So we have no history of these things ever failing. But he took the stem off. He inspected it. He cleaned it. He put Teflon tape back on it. He reinstalled it, and then he tested all of that before he left the vessel, and there was no problems with it, which is why there shouldn't be any evidence that they were negligent in providing. You're talking about what he did before. Then he when he came back aboard the vessel, he found that that had that it had broken. He said he took it off. I put it in my bag and I left the vessel. And he literally said, I just don't know where it is. He didn't say didn't say he threw it away. He said went on. He worked on two or three more vessels, but he said, I've looked. I've looked in my office. I've looked in my tool bags. I just can't tell you where it is. There's no evidence that he destroyed it. He intentionally threw it away. What we do know, though, is that that condition was known before the captain entered the engine room. So when we talk about conditions like slime on the deck or water on the deck or a transient condition, regardless of how that that failed, we know that the pressure gauge didn't hit him and the stem didn't hit him. What happened is that he fell, responding to the fuel that was on the deck condition he knew about before he entered the engine room and a condition that they trained for in their safety programs trained for in their drills. So we're dealing with a response that the employer has to have a mechanism to respond to things breaking. It's impossible. Otherwise, they have to have a method of saying fuels on the deck. We have to be able to respond to it. If we create a per se situation where there's fuel on the deck, therefore, there are no safety rules. There's no reason to follow the protocols. You can walk directly into it and fall on it. Then we've created an absolute liability scenario for the employer where they can't have a process that they could eliminate their liability. Moving to the Ativan issue, because I see that I'm out of time, is that was the only prescription that he was having refilled. And at the time that he went on there, that was the only thing that he was able to take. Without that, he was having panic attacks. He had no viable notion that he was going to be able to continue employment under that situation. All right. Thank you, Mr. Cardone. Your case and all of today's cases are under submission and the court